KELLER, J.
CONCURRING IN PART AND DISSENTING IN PART:
I respectfully concur in part and dissent in part. I concur with the majority’s well-reasoned conclusion that a directed verdict *558 may be properly granted following opening. Furthermore, I agree with the majority that the trial court properly granted a directed verdict on Harrington’s claim that Dr. Argotte failed to inform her that the IVC filter could be removed. However, I dissent as to.that part of the majority’s opinion which concludes that a directed verdict was not proper in this case.
The majority states that Harrington did not need an expert to establish the standard of care required in this informed consent case.- According to the majority, “whether the physician’s notice to the patient would provide ‘a reasonable individual’ with a ‘general understanding of the procedure and .,. [the] substantial risks and hazards inherent in the proposed treatment’ is a question ‘perfectly suited for application by jurors of ordinary competence, education, and intellect’ without the need for expert testimony.” (Citing Sargent, 467 S.W.3d at 209). While that analysis may apply in some cases, I do not believe it applies in this case. Because I believe the standard the majority developed in Swrgent and applied herein is fact-intensive, I briefly summarize the pertinent parts of the record below.
As the majority notes, Dr. Argotte performed two surgical procedures on Harrington; however, the issue on appeal involves only the IVC filter surgery. Therefore, like the majority, my focus is only on that surgery and the informed consent, or lack thereof, that Dr. Argotte obtained from Harrington.
In early May 2005, Dr. Argotte surgically placed an IVC filter prior to performing gastric bypass surgery. Harrington had no apparent problems with that Alter until December 2007, when she began to experience severe chest pain and sought treatment in the emergency room. X-rays indicated that the IVC filter had fractured; two pieces of the filter had lodged in Harrington’s lungs; and one piece had lodged in her “left pulmonary artery take off.” In order to prevent any . further migration, a surgeon removed the remainder of the filter. However, surgery to remove the pieces that had migrated was.deemed too risky and those pieces remain in place,
Harrington filed suit against Dr. Argotte and the IVC filter manufacturer. The parties eventually dismissed the manufacturer by agreed order, and Harrington proceeded against Dr. Argotte. Harrington asserted that Dr, Argotte violated the standard of care by failing to obtain adequate informed consent to perform the surgery and in how he subsequently performed that surgery. As to consent, it appears from the record that Harrington believes that Dr. Argotte should have advised her that: he was using a retrievable IVC filter; the IVC filter could be removed sometime after surgery, although he was not authorized to do so; there was a risk the IVC filter could fracture; and if the filter fractured, pieces of the filter could migrate. As to the surgery itself, it appears that Harrington’s primary complaint was that Dr. Argotte did not remove the IVC filter after he performed the gastric bypass surgery. Although Harrington ultimately dropped her claim related to the surgery, that claim is intertwined with her informed consent claim. Therefore, I summarize the testimony regarding .both informed consent and the surgery below.
Dr, Argotte testified in his deposition that he advised Harrington regarding deep vein thrombosis (DVT) and: the filter’s role in helping reduce the risks associated with DVT. He also testified that he advised Harrington of the risks associated with implantation of the filter, including the risks of fracture and migration. I note that, at the. time of the surgery, the medical community was. not aware, that this particular retrievable IVC filter had a *559 greater than average propensity to fracture and migrate, and Dr. Argotte testified that he advised Harrington that all filters carried those risks, It is not clear from Dr. Argotte’s deposition whether he advised Harrington that the filter was retrievable; however, , it is clear that Dr. Argotte only intended to retrieve the filter “if indicatr ed,” and Dr, Argotte apparently saw no such indication.
Dr. Gaar, Dr. Argotte’s expert witness, testified that the retrievable IVC filter used by Dr. Argotte in 2005 had been approved for use by the PDA, and those filters were marketed for both temporary and permanent use. According to Dr. Gaar, at the time of Harrington’s surgery, retrievable filter fragmentation was rare and the risk was thought to be no greater than the risk associated with permanent filters.[2] Despite the rarity of fracturing, Dr. Gaar stated that he would have advised.Harrington of that risk as part of “global informed consent.”
Regarding the surgery, Dr. Gaar stated that he does not personally implant IVC filters, leaving that task to interventional radiologists. However, he does require implantation of permanent filters with “super obese” patients in part because he believes the risk of DVT essentially never completely subsides post-surgery. Dr. Gaar has never recommended that an IVC filter be removed and, he noted that, in 2005, most interventional radiologists in his area would not have attempted to remove a functioning retrievable IVC filter that had been in place for more than six weeks. Finally, Dr. Gaar testified that he believes a surgeon who implants a retrievable IVC filter with the idea of removing it should discuss that option with the patient.
Dr. Silverman, Harrington’s expert witness, testified that a surgeon should not use a retrievable IVC filter unless the plan is to retrieve it. According to Dr. Silver-man, Dr. Argotte should have ■ retrieved the filter no later than six months after he performed the gastric bypass surgery. As to whether a surgeon should advise a patient of the risk of fracture and migration, Dr. Silverman was somewhat inconsistent.
Q: In [Dr. Argotte’s] care for this patient do you have any criticisms that would relate to his informed consent process?
A; I didn’t see informed .consent for the inferior vena cava filter in relation to personally discussing- the incidence of fracture and migration. ■
Q: Do you believe that a reasonably competent physician should discuss the specific risks of fracture and migration with a patient before placing an inferior vena cava filter?
A: We just said that it’s a known' complication, fracture and migration. If the surgeon himself or herself is placing the filter, then it’s incumbent upon them to actually discuss the risks of that procedure, which would include fracture and migration, which are really the main risks of that procedure.
Q: I’m going to show you what I understand to be the consent to surgery signed by Ms. ... Harrington for the vena cava filter and’ ask if the list of risks is an appropriate list of risks in this case.
A: Everything is on here except for the fracture of the filter.
Q: In May of 2005, was fracture of the filter a known risk?
*560 A: Yes.
Q: Is it your opinion that a physician should tell a patient that fracture of the filter is a potential risk of this surgery?
A: I think migration is good enough. I don’t think it’s negligence or a lack of patient responsibility or patient duties to list fracture. I think migration takes care of that.
Q: And am I correct that migration of the filter is listed on this form?
A: Yes.
Harrington testified that Dr. Argotte told her that he would not perform the gastric bypass surgery if she did not have an IVC filter. However, she stated that he did not tell her that the filter was retrievable or whether he intended to retrieve it. Harrington also testified that Dr. Argotte did not tell her about the risks of fracture or migration. And, although she admitted to signing the consent form, Harrington testified that the form was presented to her along with a number of other forms she had to sign and that no one explained the form’s contents to her.
Approximately three weeks before trial, Harrington’s counsel advised Argotte’s counsel that Harrington would not be calling any expert witnesses to testify at trial and that Harrington was only pursuing the informed consent claim. At a pre-trial conference two and a half weeks before trial and again the morning of trial, counsel for Harrington confirmed the preceding. The morning of trial, counsel for Dr. Argotte noted that Harrington was not going to call any physicians to testify at trial. Based on that lack of medical evidence, counsel argued that, without some medical testimony, Harrington would not be able to prove that the IVC filter fractured or that pieces of the filter migrated, thus, she would not be able to prove her case. Counsel for Harrington noted that Dr. Argotte had never contested the fact that the filter fractured and that pieces migrated. Furthermore, counsel noted that he could establish those facts through Dr. Argotte. The court was somewhat skeptical that Harrington could prove her case; however, the court indicated that it would address the issue when, and if, it arose during trial, and the parties proceeded with voir dire.
During his opening statement counsel for Harrington stated that Dr. Argotte did not tell Harrington that: she had a choice as to whether to have a filter implanted and to choose the type of filter; he was implanting a retrievable filter which could be removed; there were different risks and benefits for retrievable and permanent filters; he was not authorized to remove the filter; and the filter could fracture. According to counsel, if Harrington had known the preceding she would have made different decisions. Finally, counsel stated that Harrington would not be calling an expert witness to testify regarding informed consent because “[y]ou can use your own common sense and decide for yourself what a person in [Harrington’s] shoes should have been told, and you can decide whether she was told or not.”
Following this opening statement, Dr. Argotte moved for a directed verdict. In support of his motion, Dr. Argotte argued that Harrington needed an expert witness to define what the standard of care is. Harrington argued that she did not need an expert relying on language from Keel v. St. Elizabeth Med. Ctr., 842 S.W.2d 860, 862 (Ky. 1992), “that expert evidence is not required in all instances where the claim is lack of informed consent.” The court recognized the holding in Keel; however, the court noted that the hospital in Keel “offered Keel no information whatsoever concerning any possible hazards of this particular procedure[.]” Id. (emphasis in original.) Unlike the plaintiff in Keel, Harrington admitted that she had been given *561 some information, and she signed a consent form. Therefore, the court found that Harrington’s reading and application of Keel was incorrect. The court then granted Dr. Argotte’s motion because the court believed expert witness testimony was necessary and Harrington had admitted she was not going to present any such testimony.
Harrington filed a motion to alter, amend, or vacate, which the trial court denied, and this appeal followed. The Court of Appeals reversed, holding that whether an expert witness is required is fact-specific and the court could not have made that determination following opening statement because no facts had been presented to the jury.
ANALYSIS.
As the majority states, in analyzing a trial court’s directed verdict on appeal, the “test is whether ‘under the evidence as a whole it would not be clearly unreasonable for a jury to find [for the plaintiff].’ ” Citing Sawhill, 660 S.W.2d at 6. In making that analysis, the Court should view the evidence in the light most favorable to the party opposing the motion. Bierman, 967 S.W.2d at 18-19.
Initially, I note that Harrington did not argue at trial that she failed to understand Dr. Argotte’s explanation of the IVC filter surgery and its risks. She argued that Dr. Argotte gave no explanation whatsoever regarding the surgery. The majority holds that the issue is not whether Harrington was informed of the risks but whether a reasonable person would have understood the risk information that was provided. I fail to see how a reasonable person could have understood, or misunderstood for that matter, an explanation that she never received. If we take Harrington’s argument at face value, then her reliance on Keel was appropriate because expert testimony is unnecessary when a patient receives no information regarding the risks of a procedure. 842 S.W.2d at 862.
However, as the trial court noted, we cannot take Harrington’s argument at face value because she did receive information regarding the risks of the IVC filter surgery. In fact, Harrington signed a consent form acknowledging that the risks on the form had been discussed with her. Therefore, I believe the trial court correctly determined that Keel was distinguishable and, pursuant to Sargent, this Court must determine if the explanation Harrington received met the requirements of KRS 304.40-320.
In making that determination, the majority relies on Sargent and undertakes a two-step analysis. I dissented in Sargent, however, I recognize that it is currently the law and therefore should be applied to this set of facts. I believe that the majority’s application of Sargent is too simplistic. According to the majority, the first step in the Sargent analysis is to determine if Dr. Argotte obtained Harrington’s consent “in accordance with the accepted standard of medical or dental practice among members of the profession with similar training and experience.” I agree with the majority that Harrington would not have been able to prove a violation of this standard without the testimony of an expert witness.
However, I disagree with the majority that Harrington could have met the requirements of the second step without an expert witness. As the majority states, the primary issue is whether a reasonable person would have understood that the risk of the filter migrating included the risk that the filter might “break into fragments which could then migrate to other bodily organs.” The majority believes that issue “could readily be resolved by reasonable jurors without the assistance of expert testimony.” If that were the only facet of this issue, I might agree with the majority’s *562 analysis. However, I do not believe that the step-two Sargent analysis is that simple generally or as applied to this case.
KRS 304.40-320(2) provides that informed consent shall be deemed to have been given if:
A reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures!.]
I agree that, under Sargent, the jury could have decided without expert guidance whether a reasonable person could have understood that “migration” encompassed fracture and migration. However, that is not all KRS 304.40-320(2) requires. It also requires that the risk must have been a “substantial” risk that was “inherent'in the proposed treatment” and that was- “recognized among other health care providers who perform similar treatments or procedures.” Id, The majority skirts this requirement by stating that “all parties acknowledged that fracturing and fragmenting of the filter, and the subsequent migration of filter fragments, were risks associated with the procedure.”
It is true that all of the physicians agreed that there is a risk that IVC filters, either permanent or retrievable, can fracture. However, whether the risk exists is not the only issue. The risk must also be “substantial.” I do not believe that a jury of laypersons, without guidance from providers who perform similar treatments or procedures, ie., expert witnesses, can independently determine whether a risk is substantial.[3] Thus, Harrington was required to present expert testimony to at least establish the substantiality of the risk, and I cannot fault the circuit court for directing a verdict when Harrington admitted she had no such expert.
I note that the majority opinion does not address Harrington’s complaint that Dr. Argotte failed to advise her that he was using a retrievable IVC filter. I would hold that resolution of this issue required expert witness testimony for the same reasons the majority held that expert witness testimony was needed regarding Dr. Ar~ gotte’s alleged failure to advise Harrington that the filter could be removed.
Finally, although I disagree with the majority and believe the trial court correctly granted a directed verdict, I would instruct the trial court on remand to limit the parties to the evidence and witnesses that they identified in their pre-trial disclosures;
Minton, C. J. and Hughes, J. join.

. Dr. Gaar testified that data available at the time of his deposition showed the IVC filter used by Dr. Argotte fractures approximately 25% of the- time. However, at the time of Harrington's surgery; the fracture rate for that IVC filter was believed to be the same as for other retrievable and permanent filters.

. Obviously, once there has been an appropriate determination regarding the adequacy of the informed consent, a plaintiff will have to prove causation and the other elements of the tort.